**E-FILED**
Friday, 31 May, 2013  11:19:44 AM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MALIBU MEDIA, LLC<br><br>Plaintiff,<br><br>v.<br><br>JOHN DOE<br><br>Defendants | Case No. 1:13-cv-01195-JES-JAG<br><br>Hon. John A. Gorman<br><br>**ORAL ARGUMENT REQUESTED** |

**MOTION TO DISMISS FOR FAILURE TO JOIN INDISPENSIBLE PARTIES, MOTION TO QUASH SUBPEONA FOR SEEKING IRRELLEVANT INFORMATION, MOTION FOR LEAVE TO PROCEED ANONYMOUSLY, MOTION TO STRIKE EXHIBIT C AS IMMATERIAL & SCANDALOUS**

Now Comes Doe, by and through counsel, who moves this Court to dismiss the suit for failure to join indispensible parties, to quash the subpoena for seeking irrelevant information, for leave to proceed anonymously, and to strike Exhibit C as immaterial and scandalous.  In support of his[1] Motion Doe states to the Court as follows:

#### I.    Introduction

Plaintiffs have outmaneuvered the legal system.  They've discovered the nexus of antiquated copyright laws, paralyzing social stigma, and unaffordable defense costs. And they exploit this anomaly by accusing individuals of illegally downloading a single pornographic video. Then they offer to settle—for a sum calculated to be just below the cost of a bare-bones defense. For these individuals, resistance is futile; most reluctantly pay rather than have their names associated with illegally downloading porn. So now, copyright laws originally designed to compensate starving artists allow, starving attorneys in this electronic-media era to plunder the citizenry.

*Ingenuity 13, LLC v. John Doe,* No. 2:12-cv-8333-ODW(JCx) (ECF No. 130, p. 1) (C.D. Cal. May 6, 2013) (Wright, J.) (discussing a similar case that had a mass-Doe strategy).

//////

---

[1] John Doe will be referred to as a male throughout this document.
[2] According to PACER, Malibu appears to be involved in well over eight-hundred suits, despite existing for only a little over two years, according to public records from the California Secretary of State.

///////

*Malibu Past*

The Plaintiff, Malibu Media, LLC ("Malibu") is a pornographer and serial litigator, bringing its business-litigation model to courts across the country.  Malibu came into existence on February 8, 2011.  Since that time, it has been pushing forth a tsunami of suits[2] in federal courts, including at least 39 in the Central District of Illinois. Malibu previously engaged in its business model by filing what were more-or-less reverse class action lawsuits.  In those cases, Malibu alleged that by use of the BitTorrent protocol, Does, such as the current one, act as part of a swarm.  This swarm, allegedly, results in dozens or hundreds of people acting interpedently to infringe Malibu's alleged rights.  Malibu would sue dozens, or hundreds of Does, harvest their contact information, collect settlements without serving Does, and move on to the next case.  This profitable venture had costs of only a $350.00 filing fee and the drafting of a cookie-cutter Complaint & Motion for Expedited Discovery.

Despite the nationwide campaign, Malibu has never taken a case to trial, nor have its members or officers been subject to a Rule 30(b)(6) deposition.  In fact, a review of the cases it brings forth makes it apparent that upon such an event becoming imminent, Malibu has cut and run.[3]  Presumably, Malibu does so because the business model has been judicially recognized to extract quick-settlements, rather than actually litigate any case on its merits.  *See, e.g., Third Degree Films, Inc.*, 2012 U.S. Dist. LEXIS 59233, *11-12, *see also*, *Malibu Media LLC v. John Does 1-10*, No. 12-03623 (ECF Doc. 7 at 6), 2012 U.S. Dist. LEXIS 89286 at *8-9 (C.D. Cal. June 27, 2012) ("The federal courts are not cogs in a plaintiff's copyright-enforcement business model.  The

---

[2] According to PACER, Malibu appears to be involved in well over eight-hundred suits, despite existing for only a little over two years, according to public records from the California Secretary of State.
[3] It should be noted that a Court in the Eastern District of Pennsylvania has ordered a "bellwether trial."  Malibu Media, LLC v. Does 1-22, Case No. 5:12-cv-02088-MBB (E.D. Penn).

Court will not idly watch what is essentially an extortion scheme, for a case that plaintiff has no intention of bringing to a trial.").

*Malibu Present*

It appears that now, after a nationwide rejection of the swarm-theory for purposes of joining hundreds of Does, Malibu's pendulum has swung inappropriately far to the other direction.   Malibu is now cherry picking defendants and leveling dozens of alleged infringements against them, along with accusing them of downloading other films that have nothing to do with the case at hand.  Why?  The only reason would be to create the impression of a case so massive that the settlement percentages increase – now that Malibu must pay a filing fee for every Doe.

In doing so, however, Malibu has left out all-important initial seeders and at least one third-party Doe.  This new business model is in contravention of nearly every case Malibu has previously filed across this country.   As explained below, this new business-litigation strategy is as fatally flawed as the last.

*Procedural History*

This particular iteration of the business-litigation strategy of Malibu commenced when Malibu filed its cookie-cutter Complaint against an unknown person, based solely upon an Internet protocol ("IP") address that <u>does not identify an infringer</u>.  (ECF Doc. 1).  Despite having no knowledge of whether or not Doe is the actual-infringer in this case, Malibu has sought relief and was granted, *ex parte*, relief that would allow it to discover the identity of the person paying the bill for the IP address 76.23.79.204.  (ECF Docs. 2, 6).  This Court appropriately limited the information that could be harvested by Malibu to that needed to serve Doe.

II. **Legal Argument**

1. <u>When Malibu has failed to join the initial seeder, an indispensable party, the complaint should be dismissed (Fed. R. Civ. P. 19)</u>

A case may be dismissed for failure to join appropriate parties.  Fed. R. Civ. P. 19.  The Court should undertake a two-step analysis and determine (i) whether an absent party is necessary to the suit, and, (ii) if so, and if that party cannot be joined, whether the party is indispensable so that in good conscience and equity, the suit should be dismissed.  *Clinton v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir. 1999).  Here, indispensable parties are absent, and this Court cannot find in good conscience and equity that they should remain un-joined.  Accordingly the suit should be dismissed.

In the past, Malibu Media has relied on a swarm-joinder theory – going to great lengths to assert that all members of a so-called swarm[4] act interdependently and in concert to distribute a work and infringe on its rights.  In fact, all cases Malibu filed in the Central District of Illinois, until April of this year, asserted such a theory, over and over again.  In those cases, Malibu explained why an initial seeder and other Does were important in such an action, indicating: the Does are jointly and severally liable, the Does act in concert, that BitTorrent requires a swarm, that there must be an initial seeder who starts the process, that all Does work together.  *See, e.g., Malibu Media v. Does 1-14*, Case No. 2:2012-cv-02159-HAB-DGB (ECF Doc. 1,¶ ¶ 10, 15, 19, 29, 30, 31) (C.D. Ill. June 14, 2012).  Malibu in other Courts has fought to keep all the Does and seeders together when faced with motions to sever, based upon misjoinder.  Changing gears, after rejection of swarm joinder in this court and many other courts, Malibu now attempts to sue a single Doe while leaving out indispensable parties – the initial seeder and at least one additional participant in the swarm.  Malibu's new tactic amounts to alleging an impossibility – a one-man swarm.  Whether or not a mass-joinder of individuals over months is appropriate is not an issue today.  What is at issue is whether an initial seeder and at least one-third party must be joined.

//////

//////

---

[4] A term that does not appear in this particular Complaint.

*Initial Seeder*

The alleged infringement simply cannot occur without an initial seeder.  There must be a person that originally uploads the work, and already having the full file, will not be downloading from any subsequent swarm member.  That initial seeder may, in fact, have a legal privilege or right to publish or distribute the works for free.[5]  If this is the case, then Doe could not have infringed by downloading the Work.

One court, dealing with an intellectual property matter put forth that an unjoined party's rights and actions may affect the outcome of litigation, an absent party must be joined to the action. *Musumeci v. Reborn Products Co., Inc.* 184 U.S.P.Q. 736 (E.D. Pa. 1974) (requiring joinder of the intellectual property rights owner in a breach of contract claim when the patent's validity and underlying rights would have affected the litigation).  *Musumeci* is on all fours with the case before the Court today.  The validity of the rights asserted by Malibu hinges on a non-party, the initial seeder.   This concern over validity is a real concern, considering Malibu's investigator's past.

The investigator retained by Malibu – IPP Ltd. ("IPP") – in this matter was formed under the laws of Germany and is a successor to a German company formerly known as Guardaley. Previously, a German law firm retained Guardaley for the similar purposes to Malibu's.  That firm later sued Guardaley for being aware of serious flaws in its collections systems, and not disclosing them.  Upon Guardaley's appeal to an injunction, the law firm was able to successfully assert that Guardaley operated a "honeypot" scheme.  That is, <u>IPP's predecessor was the initial seeder in actions such as this, baiting the Does</u>.  See Exhibit A.

In this case, where Malibu has not named or sued an initial seeder is combined with the judicially recognized problematic tactics utilized by plaintiffs such as Malibu in the past, there is

---

[5] While at first glance, this may seem like a dubious proposition, it is a real possibility.  For example, as to the Work "I Love X Art," one can easily find and view that film, among others at http://www.pornhub.com/users/x-art. Many, if not most of the Works can be found this way.

reason to entertain the possibility that IPP, or one of its affiliates, may be the initial seeders for the Works. If this is the case, not only should a dismissal be had, but also further investigation into the matter should be conducted. If it was IPP, or an affiliate, that was the initial seeder, there can be no infringement.

Overall, in Malibu's new one-man-swarm theory, an impossibility, Does cannot defend themselves. The initial seeder, possibly having rights to distribute the Work, would provide a defense to Doe and is an integral part of the action. If the initial seeder committed no infringement, Doe could not have either. Accordingly, without this indispensable party joined, the suit should be dismissed.

*Additional Doe*

Additionally, in order to "copy" or "distribute" the work, as alleged in the Complaint, there necessarily must have been some transmission by Movant Doe to a third-party.[6] The third-party could not possibly be the seeder, because the seeder already has has the full file and would not download something it already possessed. Accordingly, there must be at least one other Doe alleged to have infringed as well, and joined as a party. This Doe is suggested to exist as Movant Doe did not provide the entire file to IPP. Complaint, ¶18. This makes third-party Doe an indispensible party to the action.[7] At least one transaction between Movant Doe and third-party Doe has to have occurred. If not, there is no distribution-infringement occurring, or, the there is simply no mandated joinder. Either way, the Complaint is fatally deficient.

Here, it is evident that there are indispensable parties absent from this action. This Court cannot find in good conscience and equity that they should remain un-joined. To do so would fatally

---

[6] Such a transaction would not give rise to a slippery slope of mass-joinder issues this Court has faced before.
[7] A second Doe that participated in the same transaction or occurrence would possibly cut down on Movant Doe's liability, as Malibu can only seek damages per work infringed, not per Defendant infringed. 17 U.S.C. § 504(c)(1). Accordingly, if the second Doe settled, the amount sought by Malibu against Movant Doe would decrease.

handicap the ability of Doe to defend himself and be a waste of judicial resources.  Accordingly the suit should be dismissed pursuant to Federal Rule of Civil Procedure 19.

2.    Malibu is seeking irrelevant information with its subpoena, and accordingly, it should be quashed

Discovery is only appropriate when the information sought is relevant.  Fed. R. Civ. P. 26(b)(1).  Information sought must be "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1), *see also, Williams v. Blagojevich*, No. 05-cv-4673, 2008 WL 68680, at *3 (N.D. Ill. Jan 2, 2008).  Courts have already concluded that the person paying an Internet bill – the information sought by the subpoena – may not be the purported infringer. This Court has acknowledged this self-evident fact.  *See, e.g., VPR Internationale v. Does 1-1,017*, No. 11-02068 (ECF Doc. 15 at 2), 2011 WL 8179128 (C.D. Ill. Apr. 29, 2011) ("Where an IP address might actually identify an individual subscriber and address the correlation is still far from perfect . . . [t]he infringer might be the subscriber, someone in the subscriber's household, a visitor with her laptop, a neighbor, or someone parked on the street at any given moment."). Other Seventh Circuit District Courts have also discussed this issue and reached the same conclusion.  *See, e.g., Malibu Media, LLC v. Reynolds,* Case No. 12-cv-6672 (ECF Doc. 51 at 13) (N.D. Ill Mar. 7, 2013).

Additionally, in order to be relevant to this proceeding, the information would have to at least lead to admissible evidence.  Fed. R. Civ. P. 26(b)(1).  By speaking to "admissible evidence," the Rule clearly implicates putting forth evidence – part of pursuing a claim on its merits, something Malibu, with over 800 actions filed, has never done.  There is no reason to believe they it is going to start now.[8]  Courts have recognized with cases like this one, "almost all end in settlement and few, if any, are resolved on their merits."  *Third Degree Films, Inc.*, 2012 U.S. Dist. LEXIS 59233, *11-12,

---

[8] In fact, a review of the docket in a Eastern District of Pennsylvania case, where the judge set a bellwether trial indicates that Malibu is attempting to delay such a trial as long as possible.  *Malibu Media, LLC v. Does 1-22*, Case No. 12-cv-02088-MBB (E.D. Penn.).

*see also*, *Malibu Media LLC v. John Does 1-10*, No. 12-03623 (ECF Doc. 7 at 6), 2012 U.S. Dist. LEXIS 89286 at *8-9 (C.D. Cal. June 27, 2012) ("The federal courts are not cogs in a plaintiff's copyright-enforcement business model.  The Court will not idly watch what is essentially an extortion scheme, for a case that plaintiff has no intention of bringing to a trial.").  It is judicially recognized that the information sought is not for the purpose of gathering admissible evidence.  Accordingly, the information is irrelevant.

Applying these principles, the only discoverable information must relate to bringing the copyright claim.  The only information that Malibu wishes to harvest from the ISP is the bill-payer's identity.  As acknowledged by this Court, the bill-payer may not be the infringer in these cases, and in fact, the actual infringer may be a total stranger. It would not be a "reasonable calculation that the individuals connected to the subpoenaed IP addresses will have any discoverable information related to the current defendants." *Pacific Century Int'l, v. Does 1-37*, 282 F.R.D. 189, 195 (N.D. Ill. Mar. 30, 2012).  For this reason, the subpoena, as issued, should be quashed.

3.  <u>Due to the highly personal nature of the allegations leveled by Malibu, Doe should be granted leave to proceed anonymously</u>

Many courts, including one colleague court, have recognized the right of some parties to proceed anonymously in "matters of a sensitive and highly personal nature." *Malibu Media, LLC v. Reynolds,* No. 12 C 6672, (ECF Doc. 51, at 11) (N.D. Ill Mar. 7, 2013).  That court has also specifically recognized the possibility of plaintiffs such as Malibu using shame and embarrassment as tools to extract settlements.  Recognizing this possibility, the court analyzed the harm to the public and found than any harm was minimal. *Id.* at 13 – 14.  Accordingly, that Court found that the public's interest does not override the privacy interest of Does in this sort of litigation. *Id.*

Concerns before this Court include a likelihood of coercion into unjustified settlements, a matter of a highly personal nature – the allegation of downloading pornography, and the fact that

Doe has not availed himself of this Court.  For these reasons, it is respectfully requested that this Court allow Doe to proceed anonymously in this case.

    4.    <u>Exhibit C serves no purpose in this litigation, and should be stricken</u>

This Court can strike any immaterial or impertinent materials.  Fed. R. Civ. P. 12(f).  Malibu admits that Exhibit C is immaterial, as the "copyrights-in-suit are solely limited to content owned by Plaintiff as outlined in Exhibit B."  There is no purpose for this additional Exhibit, C, other than to possibly increase settlement success ratios through fear, a possibility due to Malibu's mass-Doe to single-Doe switch.  For this reason, it should be stricken.

**III.  Conclusion**

For the foregoing reasons, Defendant Doe respectfully requests that this Honorable Court:

A.  Dismiss the suit for failure to join indispensable parties; and if not,

B.  Quash the subpoena; and if not,

C.  Grant leave for Doe to proceed anonymously; and

D.  To Strike Exhibit C as immaterial.

| **ORAL ARGUMENT IS REQUESTED** |
| :---: |

Respectfully submitted,

<u>/s/Jonathan LA Philips</u>
Jonathan LA Phillips
One of Doe's Attorneys
456 Fulton St.
Ste. 255
Peoria, IL 61602
309.494.6155
jphillips@skplawyers.com
ARDC No. 6302752

| Certificate of Service |
|---|

I certify that on May 31, 2013 a copy of the foregoing has been filed with the Clerk of the Court via the Court's ECF filing system, thereby serving it upon all counsel of record.

/s/ Jonathan LA Phillips

Page 1



# Facts on the Cease and Desist Letter "Antichrist," BaumgartenBrandt to ipoque, 11/18/2009

ipoque

CONFIDENTIAL
January, 2011

January 2011, CONFIDENTIAL

Exhibit A

# ipoque received a cease and desist letter for "Antichrist," which was in test screening

## Facts about the Cease and Desist Letter

**Recipient of Letter: ipoque GmbH, Mozartstr. 3, 04107 Leipzig**

**Issuer: BaumgartenBrandt, Attorneys at Law, Berlin**
Note: "Independent Security Provider" is Guardaley.

**Client: Zentropa Entertainments23 ApS**

**Work: Film "Antichrist"**

**Date, Time: 1/18/2009, 01:03:25 CET** ‗‗‗‗‗‗‗‗‗

**IP Address: 79.222.120.152**
Note: At the time in question, a test screening with this film was running at ipoque for a third-party order. It was our IP address. It is a file in the BitTorrent Network (this information is not in the cease and desist letter).

**Accusation: Offer to Download the Film by Release on the Hard Drive**

**Total Amount: 1,200.00 Euros**

**Deadline: 5/18/2010**

# The case is completely recorded and reproducible

## Facts about the Cease and Desist Letter

**The case was able to be completely reproduced.**

This test screening was running on the PFS (Peer-to-Peer Forensic System), that ipoque itself uses for investigations of copyright infringements in Peer-to-Peer networks. As a result, we recorded and saved the entire traffic recordings; the case can thus be completely reproduced and demonstrated at any time.

## We identified the other client (Guardaley)

The opposing investigators had the IP address 78.43.254.8 at the time in question. According to GoIP information, it is Baden-Würtenberg Cable, Karsruhe. In the period from 21:00 on 11/17/2009 to 02:00 on 11/18/2009, there were five different client hashes behind this IP address—one per file requested. At that time, we inquired about these files for Antichrist. This information is not in the cease and desist letter. We analyzed them from our investigation data bank:

ClientHash:              2D5554313831302D36D33E262769819289A38D1
human readable:          -UT1810-66%3E%26%27I%81%92%88%9A8SI
program and version:     -UT1810-

# The Guardaley client transmitted a characteristic bit field

## Facts about the Cease and Desist Letter

**We did not offer or upload.**

Our client neither made an offer not did it upload, since, first, our P2P client informs all other clients that it does not have anything, and, second, the client could not upload anything. We demonstrably (in the complete traffic recordings) did not make a single transfer to this client.

**The Guardaley client only inquired, but neither downloaded, nor sent us anything—ipoque also transferred nothing.**

The clients of the opposing IP always transmit a bit field 0101010101010101… (they thus claim to have every other, and thus 50%, of the files).

Screen shot 1 shows this bit field.

*Note: The screen shot was produced using Wireshark, an available program for the manual analysis of network traffic.*

**Screen shot 1: Bit field on the availability of pieces of the opposing client**

ipoque

January 2011, CONFIDENTIAL

# At no time and in no direction did a transfer take place

## Facts about the Cease and Desist Letter

**Screen shot 2 is a seamless presentation of the complete occurrence resulting in the cease and desist letter.**

1. It commences with the Handshake (Initiation of contact by the opponent)
2. TCP exchange (confirmation of the Handshake package, has nothing to do with the BitTorrent proceeding) → no BitTorrent transfer or the like takes place here, there is only an exchange to make and terminate the TCP connection
3. Confirmation of the Handshake by us
4. Opponent transmits (apparently falsified) bit field (see note above, Screen shot 1)
5. Our response that we are interested.
6. TCP (Confirmation of the Interested package from the previous step by the opponent)
7. Opponent requests a specific piece (although it knows that we do not have anything, since we sent no bit field — see note above)
8. TCP exchange (Confirmation of the request package by us)
9. Opponent again requests a piece
10. TCP (Confirmation of the request package by us)
11. TCP (Termination by us)
12. TCP (Confirmation by the opponent of the termination)
13. TCP(Termination by the opponent)
14. TCP (Confirmation by us of the termination)

*Note: The screen shot was produced using Wireshark, an available program for the manual analysis of network traffic.*

# Screen shot 2: The complete proceeding resulting in the cease and desist letter

ipoque

January 2011, CONFIDENTIAL

BaumgartenBrandt Attorneys at Law
Friedrichstr. 95-10117 Berlin

State  Court  Berlin
Littenstraße  12-17
10179 Berlin

Attorneys at Law

Dr. Ralf Baumgarten
Philipp Brandt
AndréNourbakhsch

Sekretary        Ms. Haase
Direct dial      +49 30 20 60 97 90-75
E-Mail           haase@bb-legal.de
Our code         13/11/nli

Intern. Handelszentruin
Friedrichstraße 95
10117 Berlin

T+49  3 2 6 9    9
      0 0 0 7 (1-0
F+49  3 2 6 9   90-
      0 0 0 7    20

April 15,  2011

**URGENT! Please submit immediately!**

**-16055/11**

**In the matter of the preliminary injunction**

**Guardaley Ltd. inter al. v.  BaumgartenBrandt GbR**

We substantiate our objection of  3/15/2011 as follows:

**I. Facts**

1.     **About the Parties**

Petitioner No. 1 for the injunction\*  is a capital company with limited liability
(Limited)  under English law, formed on 4/24/2008.

**Initial Proof:**   Extract from the Companies' House Register as

**– Exhibit AG 1 –**

It has maintained a branch in Germany in Karlsruhe since 1/29/2009.

1

**Initial Proof:**   Commercial Register extract for Petitioner No. 1 as

**- Exhibit AG 2 -**

Petitioner No. 2 for the injunction\*acts in commerce for Petitioner No. 1 as Director of Data Services.

**Initial Proof:**   Affidavit of Petitioner No. 2 of 12/31/2009 before the United States District Court for the District of Columbia (File no.: CA. 1:10-cv-00453-RMC) in English as

**- Exhibit AG 3 –**

Respondent against the injunction\* is a law office located in Berlin.

Attorney André Nourbakhsch (formerly Respondent No. 2 against the motion\*) is an employee of the Respondent. In such capacity, he works at the address of the Respondent solely for the Respondent and does not pursue his <u>own</u> business activities there. Without limiting the generality of the foregoing, he is not a partner or managing director of the Respondent against  the injunction.

2.         **Contractual Relationship between Petitioner No. 1 and the Respondent**

There was a contractual relationship between Petitioner No. 1 and the Respondent, on the basis of which Petitioner No. 1 developed, and made administrative software available to Respondent for the duration of the contract.

In addition, Petitioner No. 1 entered into contracts with holders of copyrights for films. The subject of such contracts is the collection and documentation, for secure evidentiary purposes, of IP connection data of internet connection owners offering for download, in infringement of copyright, copyrighted works of clients of Petitioner No. 1 to other users, in a so-called peer-to-peer procedure (also called file-sharing). In this connection, it is denied, on the basis of lack of knowledge, that the Petitioner [sic]  was also commissioned by its clients to investigate the IP data of owners of connections who merely attempted to download copyrighted works, without it being documented that the download was actually completed, much less that such works were offered via such connections for download, i.e., were publicly made available.

The Respondent also entered into contracts, for the provision of legal services, with copyright holders that had previously also entered into contracts with Petitioner No. 1 for the investigation of IP addresses. Respondent, in the context of its legal services, moves for orders to secure and reveal IP addresses of the connection owners behind the Internet service providers and asserts against such persons cease-and-desist and damages claims. Respondent is commissioned by its clients solely to proceed against such connection owners who make films publicly available, within the meaning of § 19 a of the Copyright Law, on the Internet, in infringement of copyright. It was not, and is not, commissioned to proceed against connection owners who merely attempt to download films, without offering the same to the public. For the motion to obtain the orders to secure and reveal pursuant to § 109 (9) of the Copyright Law, necessary to conduct the cease-and-desist proceedings, the Respondent presents to the respective court the Affidavit of Petitioner No. 2, in which Petitioner No. 2 declares that that only such IP addresses are identified as offering filmed works for download. He did not declare therein that Petitioner No. 1 investigates the IP addresses of persons who merely download filmed works or who have only attempted to do so.

**Initial Proof:** Affidavit of Petitioner No. 2 as

**- Exhibit AG 4 -**

Clients of Petitioner No. 1 were, and some still are, still clients of Respondent. Mr. Mark Damon, who is mentioned in the Affidavit of Ms. Barbara Mudge, represents, for example, the company Foresight Unlimited, located in the USA, and which at the time of the statements at issue in this

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 10 of
Case 5:12-cv-02083-JMB   #Document 55 of 35iled 11/20/12   Page 11 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 3 of 18

dispute was both a client of Petitioner No. 1 and a client of the Respondent. In order to comply with its obligations as attorneys pursuant to the service agreements with its clients pursuant to the Federal Attorneys' Regulation and the Regulation of Professional Responsibility, Respondent naturally continues to maintain contact with its clients, and thus with Mr. Mark Damon of Foresight Unlimited, irrespective of the existence of contractual relationships of clients of Petitioner No. 1.

### 3. Termination of the Contractual Relationship between Petitioner No. 1 and the Respondent

Respondent terminated, as of 1/21/2011, the contract between Petitioner No. 1 and the Respondent, without notice. The termination was sent to the Petitioner No. 1 and was received by the latter prior thereto by fax on 1/21/2011.

> **Initial Proof:** Termination letter by the Respondent dated 1/21/2011 with transmission report of the fax transmission on 1/21/2011, 20:07 as
>
> **- Exhibit AG 5 -**

In addition, as of 1/25/2011, Petitioner No. 1 declared to the Respondent, over the signature of Petitioner No. 2, the termination, without notice, of the of the existing contract. The termination was received by the Respondent by fax on 1/25/2011, at14:37 and on 1/26/2011 by mail.

> **Initial Proof:** Telefax of the Termination Letter of Petitioner No. 1 for the injunction dated 1/25/2011, 14:37
>
> **- Exhibit AG 6 -**

Thus, the Petitioners knew, at least at the time of sending the motion for preliminary injunction to the State Court of Berlin, of the termination of the contract by the Respondent. While the motion for the issuance of the preliminary injunction is dated 1/21/2011, it was not received by the Court until 1/26/2011. The sending of the motion thus cannot have occurred prior to Tuesday, 1/25/2011. In fact, we allege that the Petitioners sent the motion for issuance of the preliminary injunction after 1/25/2011, 14:37, i.e., after receipt by Respondent of the termination by Petitioner No. 1. If the Petitioners are of a different view, then let them state and prove such.

To the extent the Petitioners in their motion for issuance of the preliminary injunction state that they were in a contractual relationship with the Respondent commencing in 2009, then the result is that they intentionally failed to state the fact that such contract had ended as of 1/21/2011. We expressly refer to the criminal law relevance of such false testimony.

### 4. Telephone Conversation between Mr. Nourbakhsch and Ms. Barbara Mudge

#### a. Professional Position of Ms Barbara Mudge and Reason for Calling Her

Ms. Barbara Mudge is a member of the Board of Directors of the Independent Film and Television Alliance (IFTA) in Los Angeles, USA. She is responsible for companies from the film industry that are IFTA members. Included among such companies is, as can be seen from the text of the Affidavit of Ms. Barbara Mudge (Exhibit AS 3), Foresight Unlimited, represented by Mr. Mark Damon.

Ms. Mudge has also been active for some time as an employee of Petitioner No. 1.

> **Initial Proof:** Email of Ms. Barbara Mudge of 2/25/2011 as
>
> **- Exhibit AG 7 -**

Thus, Ms. Mudge was, and is, at no time a client of Petitioner No. 1, but rather its employee.

In addition, neither the Petitioners nor Ms. Barbara Mudge state, in the grounds of the motion or in the preliminary injunction, the background of the telephone conversation between Ms. Mudge and Mr. Nourbakhsch. Ms. Barbara Mudge did not, as the grounds of the motion and the Affidavit might suggest, call Mr. Nourbakhsch for no reason. Rather, the telephone call took place after the Respondent had called its client, Foresight Unlimited. Apparently, thereafter Mr. Mark Damon of Foresight Unlimited called Ms. Mudge. It is impossible for us to know whether Ms. Mudge was then speaking to Mr. Nourbakhsch as a representative of Foresight Unlimited or in her capacity as an employee of Petitioner No. 1. In any case, the conversation took place at the desire, and on the initiative, of Ms. Mudge and with the knowledge of the client of the Respondent, Foresight Unlimited.

The information transmitted to Ms. Mudge in the conversation with Mr. Nourbakhsch related solely to the client relationship between the Respondent and the client, Foresight Unlimited, and the telephone conversation previously conducted with Mr. Mark Damon. Ms. Mudge wanted to hear again for herself the questions raised therein. In this connection, reference was expressly and repeatedly made during the conversation to the conversation with Mr. Damon and Ms. Mudge repeatedly stated that Mr. Damon was her client and that she was, in her telephone call, complying with his request that she hear for herself was had been stated to him.

        **Initial Proof:**   Testimony of Mr. Nourbakhsch, to be subpoenaed
                              via the Respondent

The grounds for the motion and the Affidavit of Ms. Barbara Mudge also give the impression that Ms. Mudge was called on 1/5/2011 at the initiative of Mr. Nourbakhsch. In fact it was Ms. Barbara Mudge herself who initially tried to call Mr. Nourbakhsch on 1/5/2011, at ca. 16:30.

        **Initial Proof:**   Testimony of the employee of the Respondent, Ms.
                              Nadine Haase, to be subpoenaed via the Respondent

Since Mr. Nourbakhsch was not available at the time of Ms. Mudge's call, Mr. Nourbakhsch as well as Mr. Philipp Brandt, Partner of the Respondent, called Ms. Mudge back on the same day.

        **Initial Proof:**   Testimony of Mr Nourbakhsch, to be subpoenaed
                              via the Respondent

Ms. Mudge has incompletely and incorrectly represented the contents of the telephone conversation. At the time of making the Affidavit of 1/16/2011, and thus 11 days after the telephone conversation, Ms. Mudge was apparently unable to remember precisely the contents of the conversation. This is seen in the fact that she writes: "In gist, a telephone conversation with the following contents took place". Thereupon she provides „the gist" of a summary of the contents of the conversation, abridged to the motion for the injunction and incorrectly and incompletely states what was said. In addition, the conversation was in English, and thus a foreign language for Mr. Nourbakhsch. Moreover, the contents of the conversation were of a legal nature, as a result of which, Ms. Mudge, who unlike Attorney Nourbakhsch, is not an attorney, could have misunderstood what Mr. Nourbakhsch said.

That Ms. Mudge misunderstood the contents of the conversation, is seen with respect to the statement (which is no longer part of the dispute) in Point 1) of the Affidavit (Exhibit AS 3). Already in this Point Ms. Mudge incorrectly stated what was said: Mr. Nourbakhsch informed Ms. Mudge that Petitioner No. 1 had, over a period of five months, transmitted to another law firm IP connection data that Petitioner No. 1 had collected for a copyright holder which was being legally represented by the Respondent. Such law firm had then, at the instigation of Petitioner No. 1, conducted, in the name of the copyright holder, copyright proceedings pursuant to § 101 ( 9) of the Copyright Law at various State Courts and had obtained appropriated orders for the disclosure of the data on the owners of the Internet connections. Mr. Nourbakhsch informed Ms. Mudge that there was an exclusive client relationship between the copyright holder and the Respondent and the Petitioners did not inform the copyright holder of the transmission of the data to the third law firm. In contrast therewith, Ms. Mudge alleges in the Affidavit that Mr. Nourbakhsch stated that legal titles had been obtained which had been assigned to the Respondent. The Respondent does not have rights assigned to it. It is also incomprehensible for Ms. Mudge to claim that Mr Nourbakhsch

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 12 of
Case 5:12-cv-02088-JMB   #Document 55-9   Filed 11/20/12   Page 13 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 5 of 18

claimed that the third law firm had instituted legal complaint.

**b. As to the statements in the conversation that relate to the dispute**

**aa. As to Heading Point 1. a) — Theft of Software**

In the telephone conversation at issue with Ms. Mudge, Mr. Nourbakhsch did not say that Petitioner No. 2 had stolen the investigation software used by Petitioner No. 1 from a Swiss company. Rather, Mr. Nourbakhsch merely informed Ms. Mudge about the circumstances of the previous employment of Petitioner No. 2 with Logistep AG. Specifically, he informed her that the Petitioner No. 2 had been employed until October 31, 2008, as Manager of the Technical Department of Logistep AG and that the latter had developed software for the investigation of copyright infringements. In an affidavit for a complaint in the USA against Petitioner No. 1 that has been published in the Internet Petitioner No. 2, however, claimed that he had been working for the Petitioner No. 1 since the beginning of 2007.

> **Initial Proof:** Testimony of Mr.Nourbakhsch, to be subpoenaed via the Respondent

In addition, Mr. Nourbakhsch reported to Ms. Mudge that employees of Logistep AG had seen in the company car of Petitioner No. 2, during the latter's employment for Logistep AG, brochures and business cards of Guardaley Ltd.

> **Initial Proof:** Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

Mr. Nourbakhsch expressly informed Ms. Mudge, that on the basis of the overall appearance of the circumstances, he could no longer, despite the long and good cooperation with the Petitioners, assume with certainty that Petitioner No. 2 had not, in the development of the software of Petitioner No. 1, had illegal recourse to the copyrighted know-how of Logistep AG. Mr. Nourbakhsch repeatedly emphasized that so far it was all only justified uncertainty, that the Respondent had, however, tried and was continuing to attempt to clarify the issue with Petitioner No. 1, in order to remove the doubts.

> **Initial Proof:** Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

In addition, Mr. Nourbakhsch told Ms. Mudge, that Petitioner No. 2 was not willing, despite written demand by the Respondents, to dispel such uncertainties by making an affidavit.

> **Initial Proof:** Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

Ms. Mudge failed to state all of these details in the Affidavit. She only reports what "stuck in her mind" after the telephone conversation of 11 days previously. And that is solely her own conclusion from the details of what was said, to wit, that the software had been "stolen".

**bb. As to Heading Point 1.b) aa) — Undependable Research Service**

Mr. Nourbakhsch indicated to Ms. Mudge that the Respondent had learned that the IP connection data determined by the Petitioner No. on the commission of the copyright holders was not 100% accurate. That the Petitioner No. 1 had included not only so-called uploaders, i.e., those offering works, but also persons who had made download <u>inquiries</u> to Petitioner No. 1. In addition, Mr. Nourbakhsch said that Petitioner No. 1 did not distinguish between up- and download determinations or did not mark them appropriately. The download inquiries were [verb missing…probably "designated"] as "Determinations", of which it was unable to be determined how many there were, without exception for civil law copyright claims without meaning. This meant that an unknown number of cease and

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 13 of
Case 5:12-cv-02088-JMB   Document 55-7   Filed 11/20/12   Page 14 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 6 of 18

desist letters about copyright infringements might have been undertaken without a legal basis and that the Respondent did not have any way, either at that time, or today, of identifying such. Finally, Mr. Nourbakhsch indicated to Ms. Mudge that unjustified cease and desist letters could, in certain circumstances, result in damages claims of the persons receiving such letters against the copyright holders.

> **Initial Proof:** Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

### cc. As to Heading Point 1.b) bb) — Class Action in the USA Pending

Mr. Nourbakhsch indicated to Ms. Mudge that a class action complaint was to be found on the Internet, from which it could be seen that a plaintiff had instituted suit for himself as well as for 4,500 other affected persons against various parties, inter alia, Petitioner No. 1. He also informed her that the complaint was, on the basis of the grounds, based upon the accusation of "fraud and extortion".

> **Initial Proof:** Testimony of Mr. Nourbakhsch, to be subpoenaed via the Respondent

### d. As to Heading Point 1. b) cc) — Offering Services by Others

In addition, the Affidavit of Ms. Mudge is incorrect to the extent that it claims that Mr Nourbakhsch offered to have investigations performed for "her clients" by another, specified company. The only correct aspect of this statement is that Ms. Mudge asked Mr. Nourbakhsch if there were other service providers as an alternative to Petitioner No. 1. Mr. Nourbakhsch answered this question by saying that there were numerous firms on the market. In response to the additional question by Ms. Mudge, as to whether and to what extent a change of service provider was possible, Mr. Nourbakhsch, in the context of his technical understanding, answered that the assumption of investigative activities by another firm was at least technically possible without problem.

### 5. In the Alternative: No Allegation of Untrue Facts

There would also be true facts in the statements forming the subject of the dispute. With respect thereto, individually:

### a. As to Heading Point 1. a) — Theft of Software

It is claimed that, in the development of the software used for research by Petitioner No. 1, that the software was thus "stolen". That the investigative software of Petitioner No. 1 is based on the knowledge of third parties can be concluded from the circumstances, particularly the circumstances relating to the employment of Petitioner No. 2.

In the judicial proceeding before the United States District Court for the District of Columbia, Petitioner No. 2 claimed, in an affidavit of 12/31/2009 (File No.: CA. 1:10-cv-00453-RMC) to have been employed since January 2007 for the Petitioner No. 1.

> **Initial Proof:** Affidavit of Petitioner No. 2 before the United States District Court for the District of Columbia dated 12/31/2009 (File No.: CA. 1:10-cv-00453-RMC) in the English language, previously submitted as
>
> - Exhibit AG 3 -

He was, however, employed at Logistep AG, with its offices in Steinhausen, Switzerland, in a managerial position as Chief Technical Officer, i.e., Manager of Technology. Thereafter, until 2/21/2009, he was an independent contractor for Logistep AG.

**Initial Proof:** 1. Affidavit of Mr. Richard Schneider, Member of the Administrative Board of Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland as

- **Exhibit AG 8 -**

2. Testimony of Mr. Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

Logistep AG provides, as does Petitioner No. 1, services in the Internet and in the area of Internet security.

**Initial Proof:** 1. Commercial Register extract of Logistep AG as

- **Exhibit AG 9 -**

2. Affidavit of Mr. Richard Schneider, Member of the Administrative Board of Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland, previously submitted as

- **Exhibit AG 8 -**

3. Testimony of Mr. Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

Logistep AG was one of the first companies to develop and use software for the collection, for secure evidentiary purposes, of IP addresses. Such software was develop by several Logistep AG employees over a period from February 2004 to May 2005 and has continuously been developed since then.

**Initial Proof:** 1. Affidavit of Mr. Richard Schneider, Member of the Administrative Board of Logistep AG, previously submitted as

- **Exhibit AG 8 -**

2. Testimony of Mr. Richard Schneider, Logistep AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

Petitioner No. 2 never disclosed to Respondent that he had worked for Logistep AG in the past, nor did he disclose that he had been employed by Logistep AG until October 31, 2008, and had worked with it until 2/21/2009 as an independent contractor.

According thereto, Petitioner No. 2, by his own statement, worked in a parallel fashion for Petitioner No. 1 in the same position, without disclosing this to Logistep AG.

Petitioner No. 2 also had, prior to his departure from Logistep AG his calls secretly forwarded from his office telephone number at Logistep AG to his cell phone number, 0176-24791824. He had the call forwarding installed, not on his telephone, but rather at the Logistep AG telephone services provider, so that the call forwarding would not be seen on the displays of the Logistep

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 15 of
Case 5:11-cv-02088-JMG   Document 55-9   Filed 11/20/12   Page 16 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 8 of 18

AG telephones. The call forwarding was discovered by chance only on 4/29/2010 by Mr. Richard
Schneider and Mr. Michael Wicher of Logistep AG.

**Initial Proof:** 1. Affidavit of Mr. Richard Schneider,
Member of the Administrative Board of
Logistep AG, previously submitted as

**- Exhibit AG 8 -**

2. Testimony of Mr. Richard Schneider, Logistep
AG, Sennweidstr. 45, 6312 Steinhausen, Switzerland

3. Affidavit of Mr. Michael Wicher, Mitarbeiter der
Logistep AG as

**- Exhibit AG 10 -**

In addition, Petitioner No. 2, while he was working for Logistep AG, had all emails directed to his
email address achache@logistepag.com at Logistep AG forwarded to his private email address.

**Initial Proof:** Affidavit of Mr. Leszek Oginski, Direktor der
Logistep AG as

**- Exhibit AG 11-**

Finally, Mr. Oginski of Logistep AG saw brochures and business cards of Guardaley Ltd. In the
company car of Petitioner No. 2, while he was still working for Logistep AG.

**Initial Proof:** Affidavit of theHerm Leszek Oginski, Director
der Logistep AG, previously submitted as

**- Exhibit AG 11 -**

Petitioner No. 2, however, offered, in the name of Petitioner No. 1, to the Respondent already on
12/10/2008, i.e., while he was still working for Logistep AG as an independent contractor, to
collect data on internet connection owners who offer copyrighted works for downloading on the
Internet.

**Initial Proof:** Email dated 12/10/2008 of Petitioner No.       2 as

**Exhibit AG 12 -**

In light of the fact that Logistep AG employed three employees for some 16 months in the
development of its investigative software it is remarkable that Petitioner No. 1 was able, prior to
the departure of Petitioner No. 2 from Logistep AG, to offer the same services as Logistep AG.

The doubts of Respondent as to the copyright status and above all as to the reliability of the
„Observer" software were intensified by reason of the fact that Petitioner No. 2 contacted Mr.
Nourbakhsch on 11/30/2011 by email and requested that the Respondent only use the expert
opinion on the functionality and reliability of the "Observer" software only in critically
necessary cases, without being able to state a credible reason therefor.

**Initial Proof:** Email of 11/30/2010 of Petitioner No. 2 as

**- Exhibit AG 13 -**

As a result of the aggregate impression of such facts, the Respondent began to have doubts about the copyright status of the "Observer" data collection software of the Respondents [sic {has to be "Petitioners"}]. The Respondent feared that Petitioner No. 2 could have had recourse to the know-how of his previous employer, Logistep AG, in the development of the investigative software used by Petitioner No. 1.

As a result, Mr. Nourbakhsch asked both Petitioners for a binding counterstatement in the form of an affidavit for the purpose of removing such misgivings.

> **Initial Proof:** Email of Mr. Nourbakhsch of 1/12/2011, with
> attachments, as
>
> **- Exhibit AG 14 -**

Both Petitioners refused, until making the motion for preliminary injunction, to make such an affidavit and thus to remove such doubts. All they did was inform the Respondent that they had transmitted the affidavits to a Mr. Guido Hettinger and that that the affidavits would be able to be executed „only after the completion of an outside examination".

> **Initial Proof:** Email of Petitioner No. 2 dated 1/14/2011
>
> **- Exhibit AG 15 -**

Only in the context of the motion for preliminary injunction did the Petitioners make such a statement.

### b. As to Heading Point 1. b) aa) — Unreliable Investigative Services

Petitioner No. 1 is, as noted above, obligated and authorized to collect for the Respondent only the IP data of so-called uploaders, but not, that of persons who only engage in a so-called download or only inquire as to a download of copyrighted films. Commensurately, the Respondent only issues cease and desist letters against the upload, as making publicly accessible pursuant to § 19 a of the Copyright Law.

In January 2011, Respondent learned from ipoque GmbH that the investigative services being performed by Petitioner No. 1 were, in part, not what had been agreed upon with the copyright holders and did not correspond with the cease and desist letters and were thus unreliable.

ipoque GmbH is an IT firm that offers various services in the area of bandwidth and Internet management. The company is active internationally, inter alia, for various German universities.

> **Initial Proof:** 1. Presentation of representative clients of ipoque GmbH
> under their Internet presence at
> http://www.ipoque.comicompany/customerreferences as
>
> **- Exhibit AG 16 –**
>
> 2. Testimony of Dr. Frank Stummer, to be subpoenaed via
> ipoque GmbH, Mozartstral3e 3, 04107 Leipzig

One area, for which, inter alii, Dr. Frank Stummer is responsible, is the forensic data investigation of IP addresses where copyright infringements are occurring.

On the basis of the following incident, ipoque GmbH determined that Petitioner No. 1 collects IP data on owners of connections which are not making any films publicly available, which are thus not engaging in any "upload."

On 11/18/2009 at 01:03:25 CET, ipoque GmbH conducted a so-called test screening of the film „Antichrist" on the Internet. This film was being investigated at such time by Petitioner No. 1, on

Internet exchanges, especially Peer2Peer networks such „Bittorrent", in the name of the copyright holder. The IP addresses collected by Petitioner No. 1 were identified by the Respondent in a proceeding pursuant to § 101 (9) of the Patent Law and a cease and desist letter sent to the owners of the connection pursuant to §§ 97, 19a of the Patent law, for the impermissible making publicly available of the aforementioned film.

In the course of such test screening, ipoque GmbH's software searched for the sources of illegal copies of the aforementioned film in the „Bittorrent" network, i.e., searched for download possibilities from servers offering such files (uploaders). On the ipoque GmbH servers there was at this time, as at no other time, a complete or partial copy of the work "Antichrist". For this reason, no part of the film "Antichrist" was offered in the „Bittorent" network by ipoque GmbH, nor was this impression given on the Internet.

**Initial Proof:**   1. Testimony  of  the expert witness, Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstrafle 3, 04107 Leipzig

2. Powerpoint presentation by ipoque GmbH "Facts about the Cease and Desist Letter for "Antichrist," BaumgartenBrandt to ipoque, 11/18/2009" dated 1/13/2011 as

**- Exhibit AG 17 -**

Following the test screening, ipoque GmbH received a cease and desist letter, including an assessment of costs, from the Respondent, in which it was demanded that ipoque GmbH make a cease and desist undertaking by 5/18/2010. The accusation was of an upload constituting a copyright infringement, i.e., the making publicly available of the film „Antichrist" at the aforementioned time of the test screening.

**Initial Proof:**   1. Testimony  of Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstral3e 3, 04107 Leipzig

2. Cease and desist letter of 4/27/2010 to ipoque GmbH as

**- Exhibit AG 18-**

It is documented, as reliable evidence, that it is technically impossible for ipoque GmbH to have offered such a file in whole or in part, for a so-called "upload" to have occurred.   It is also technically impossible for a download of the file to have occurred, which was not an accusation made in the cease and desist letter. At the time in question, there was contact with only one single third-party server on the part of ipoque GmbH, which this can only be attributed to Petitioner No. 1. But Petitioner No. 1, for its part, did not offer parts of the film. Rather, the Bittorrent monitoring program [of] Petitioner No 1 was set in such a way that it represented to other users, i.e., to their programs, by means of a falsified bit field, that it was always in possession of 50% of the file being sought, i.e., as to which inquiry was being made.

**Initial Proof:**   1. Testimony  of  the expert witness, Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstrafle 3, 04107 Leipzig

2. Powerpoint presentation by ipoque GmbH "Facts about the Cease and Desist Letter for "Antichrist", BaumgartenBrandt to ipoque, 11/18/2009" dated 1/13/2011 as

**- Exhibit AG 17 -**

For purposes of technical understanding, it should be explained that, as soon as a Bittorrent client

10

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 18 of
Case 5:12-cv-01288-JWB   Document 55-9   Filed 11/20/12   Page 19 of 26
Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 11 of 18

program of a user receives such a notice from another client program, it sends to the client of the other user a download inquiry for such file parts. Such an inquiry was sent at the time from the program (client) of ipoque GmbH to the server of Petitioner No. 1 and thereupon the IP address of the user, i.e., specifically the former IP address of ipoque GmbH's server, was recorded by Petitioner No. 1. That occurred even though ipoque GmbH neither offered an upload in infringement of copyright nor effected a download in infringement of copyright, because the server of ipoque GmbH could not receive any parts of the copyrighted file from the server of Petitioner No. 1, because they were not there.

| | | |
|---|---|---|
| **Initial Proof:** | 1. | Testimony of the expert witness, Dr. Frank Stummer, to be subpoenaed via ipoque GmbH, Mozartstrafle 3, 04107 Leipzig |
| | 2. | Powerpoint presentation by ipoque GmbH "Facts about the Cease and Desist Letter for "Antichrist,"BaumgartenBrandt to ipoque, 11/18/2009" dated 1/13/2011 as |

**- Exhibit AG 17 -**

The consequence of this was that ipoque GmbH wrongfully received a cease and desist letter, on the basis of incorrect data collection.

After such cease and desist order became known, Petitioners had a meeting with ipoque GmbH's attorneys, as well as with Mr. Stummer. In the context of such meeting the aforementioned power point presentation (**Exhibit AG 17**) was shown to the Petitioners.

| | |
|---|---|
| **Initial Proof:** | Testimony of Mr. Dr. Frank Stummer, to be subpoenaed via ipoque Mozartstral3e 3, 04107 Leipzig |

Subsequently, Petitioners intentionally failed to disclose the entire contents thereof to the Respondent and to the clients of Petitioner No. 1. Only when the Respondent happened to have contact with ipoque GmbH in January 2011, did it learn that Petitioner No. 1 had made incorrect data determinations. After ipoque GmbH informed the Respondent by telephone that the monitoring services of Petitioner No. 1 were defective, employees of the Respondent, including Mr. Andre Nourbakhsch and Mr. Christian Roloff traveled on 1/13/2011 to ipoque GmbH at its offices in Leipzig and had the course of the test screening explained to them, using the PowerPoint presentation that ipoque GmbH had already shown to Petitioner No. 1.

| | | |
|---|---|---|
| **Initial Proof:** | 1. | Testimony of Mr. André Nourbakhsch, to be subpoenaed via the Respondent |
| | 2. | Testimony of Mr. Christian Roloff, to be subpoenaed via the Respondent |

c.      **As to Heading Point 1. b) bb) — Class Action pending in the USA**

Contrary to the allegation of Petitioners, a class action is pending in the USA against Petitioner No. 1. Mr. Dimitriy Shirokov, in his own name and in the name of 4,756 persons, instituted suit against Dunlap, Grubb & Weaver PLLC, US Copyright Group, Thomas Dunlop,

Nicholas Kurtz, Petitioner No. 1 and Achte/Neunte Boll Kino Beteiligungs Gmbh & Co KG. The plaintiffs there are being represented by the law firm of BOOTH SWEET LLP in Cambridge, Massachusetts, USA..

> **Initial Proof:** Class action by 4,756 plaintiffs against, inter alia, Petitioner No. 1, made available online under http://boothsweet.com/wpcontent/uploads/2010/08/ Master-Complaintl.pdf by the law firm of BOOTH SWEET LLP, 32R Essex Street Studio 1A, Cambridge, MA 02139, USA, as

> **- Exhibit AG 19 -**

The complaint was filed no later than 11/26/2010 at the United States District Court, District of Massachusetts. It has the file number 1:10-CV-12043-GAOt. On 11/26/2010, the court sent a notice to the defendants as to the fact that complaint had filed. The notice said: „A lawsuit has been filed against you".

> **Initial Proof:** Notice of 11/26/2010 of the United States District Court, District of Massachusetts to the defendants as to the filing of a complaint

> **- Exhibit AG 20 -**

The notice of the court also contained the demand to the defendants to answer the complaint within 21 days. In the system of prosecution of civil matters by the parties, the notice of the court of 11/26/2010 is sent to the defendants there by the attorneys of the plaintiffs. The Respondent has no knowledge of the extent to which the complaint has been received by Petitioner No. 1.

We assume that the Director of Petitioner No. 1, when he writes in his Affidavit (Exhibit AS 1) that a complaint of one individual person existed that the Petitioner No. 1 did not receive within 21 days, is referring to the complaint in **Exhibit AG 19**. In the complaint in **Exhibit AG 19** reference is made only to the „Plaintiff" in the singular; as one, however, can easily see when one reads the designation of the parties and Point 1 of the Introduction, Mr. Dimitriy Shirokov sued for injunctive relieve „on behalf of himself and all others similarly situated" and „on behalf of himself and 4,576 other similarly-situated victims" against, inter al., Petitioner No. 1. In addition, the complaint was filed and accepted as a „Complaint Class Action", i.e., a class action. Unlike in the Federal Republic of Germany, this is possible in the United States. Other complaints in the USA against Petitioner No. 1 were not able to be located on the Internet, where complaints have to be made available, by the Respondent. Die Petitioner No. 1 is politely requested, if it intends to maintain its allegation that a complaint by one single person existed, to submit the complaint of such single person.

At bottom, it is clear that a class action complaint by 4,576 persons is pending and that Mr. Nourbakhsch, in his statement that 4,300 persons had filed a class action complaint against Petitioner

No. 1, had actually understated the situation. The statement by the Director of Petitioner No. 1, Mr. Ben Perino, in the affidavit (Exhibit AS 1), that there had been <u>at no time</u> a class action complaint against Petitioner No. 1, thus is, in consequence, contrary to the facts.

6.   **Defective or Incomplete Service of the Order of 2/10/2011**

The order of the State Court of Berlin of 2/10/2011 was neither delivered directly to Mr. Nourbakhsch nor was the order given to a person living or employed at the home address of Mr.

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 20 of
Case 5:12-cv-00208-MMB   Document 65-7   Filed 11/20/12   Page 21 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 13 of 18

Nourbakhsch or deposited into the mail box at the home address of Mr. Nourbakhsch. Only the Respondent received a certified copy of the order, addressed to Mr. Nourbakhsch. This was deposited on 2/11/2011 in the mail box of the order. The undersigned, however, have not appeared, either vis-á-vis the Court, nor vis-á-vis the Petitioners, as the procedural or trial representatives of Mr. Nourbakhsch.

The order of 2/10/2011 was deposited in the mail box of the Respondent, to wit on Friday, 2/11/2011 at its offices, but without the motion and the exhibits thereto.

## II. Legal Considerations

1.  **No Execution of the Preliminary Injunction**

a.  **No Service of the Order upon Mr. Andre Nourbakhsch**

As a result of the failure to serve the order of 2/10/2011 upon Mr. Nourbakhsch, the order has not been executed vis-á-vis the latter, §§ 936, 929 (2) Code of Civil Procedure. The order was neither served upon him directly pursuant to § 191 Code of Civil Procedure, taken together with § 177 Code of Civil Procedure, nor as a substitute service pursuant to § 178 (1) No. 1 Code of Civil Procedure at the home of Mr. Nourbakhsch.

Depositing the order in the mail box of the Respondent does not constitute effective service upon Mr. Nourbakhsch. Service at the address of his professional activity, by placing in the mail box of the Respondent, was not possible as substitute service pursuant to § 178 (1) No. 2 Code of Civil Procedure, § 180 sent.. 1 Code of Civil Procedure. The address of the Respondent is not the office of Mr. Nourbakhsch within the meaning of § 178 (1) No. 2 Code of Civil Procedure. An office within the meaning of § 178 (1) No. 2 Code of Civil Procedure is an area devoted to the business activity of the recipient of service (Baumbach/Lauterbach/Albers/Hartmann, [Commentary on the] Code of Civil Procedure, 69th ed.,, 2011, § 178 note 16; Federal Supreme Court {for non-constitutional matters}] N[eue]J[uristische]W[ochenschrift]-R[echtsprechungs-]R[eport=New Legal Weekly –Case Report]** 2010, 489 (490) note 15). The recipient of service himself has to maintain a business office under the address (Federal Supreme Court, NJW 1998, 1958 (1959)). Since Mr. Nourbakhsch, as an employee, does not pursue his own business activities in the offices of the Respondent, as noted above, substitute service at the address of the Respondent is, for such reason, excluded.

Since there was not, prior to the substitute service, any attempt to effect service upon the recipient of the service personally, substitute service pursuant to § 178 (1) No. 2 Code of Civil Procedure, § 180 sent. 1Code of Civil Procedure is also excluded.

Service pursuant to § 172 (1) Code of Civil Procedure was also not effectively made upon Respondent as the procedural representative of Mr. Nourbakhsch, since the Respondent was not, or [sic] is not, the procedural representative of Mr. Nourbakhsch While the Respondent appeared as the representative of Mr. Nourbakhsch in the pre-trial cease and desist [matter], such appearance does not extend, however, to the judicial injunctive proceeding. The judicial proceeding commencing with the service of the preliminary injunction is, with respect to the pre-trial attorney correspondence about a cease and desist letter, a new phase and is to be distinguished therefrom (Superior State Court of Hamburg NJW-RR 1993, 958; Musielak, [Commentary on the] Code of Civil Procedure , 7th ed. 2009, § 172, note 2).

Since, however, the order was not executed vis-á-vis Mr. Nourbakhsch, he is no longer a party to the proceeding and can thus be heard as a witness. As the [Berlin] Superior Court has held, a party to a dispute who, while he was a party to the proceeding in the first instance, but, by reason of failure to appeal, is not a party to the appellate proceeding being pursued by the other parties to the dispute, may be heard as a witness (Superior Court [for Berlin], M[onatsschrift für]D [eutsches]R[echt=Monthly Journal on German Law] 1981, 765). The Superior State Court of Koblenz held the same (Superior State Court of Koblenz, NJW-RR 2003, 283). The same

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 21 of
Case 5:12-cv-00203-MMB-JMB   #Document 55-7   Filed 11/20/12   Page 22 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 14 of 18

conclusion has to apply to the opponents of a motion for a preliminary injunction who are, as a result of failure to execute the injunction, no longer parties to the proceeding.

**b.    Service of the Order upon the Respondent without the Motion**

The Petitioners have also not executed the injunction vis-á-vis the Respondent. To effect execution, there had to have been, in addition to the service of the order, a service of the motion as well, since the order of the LG Berlin of 10.02.2011 is, read alone, without the motion, not able to be understood.

Reference to the motion is made several times in the order. Thus, already in the decision as to costs, the calculation is made on the basis of the motion. The Respondent thus does not know to which points in the heading the partial amounts in controversy relate. In addition, in the grounds of the decision, on p. 5, 3rd paragraph, a position is taken on the partial prayer in 2.d) of the motion, without it being clear to the Respondent what prayer is meant, and what statement is supposed to be unfair pursuant to § 4 No. 10 Unfair Competition Law.

In cases where an order of injunction refers to the motion in the heading or even only in the grounds, the motion is to accompany the injunction (State Court of Wuppertal, Judgment of 3/18/2009, File No.: 3 0 480/08). This is all the more true, where the injunction refers to the motion and the injunction is not understandable when read alone (Superior State Court of Celle, Judgment of 2/3/1999, File No..: 2 U 279/98, juris [an online legal databank, similar to Lexis]).

**2.    No Claim for Injunctive Relief**

**a.    No Competitive Relationship between the Parties**

There is no competitive relationship between Petitioners and the Respondent. The characteristic of being a competitor pursuant to § 8 (3) Nos. 2 and 3  Unfair Competition Law is excluded at the outset in the case of the Respondent. The Respondent is, however, also not a competitor of the Petitioner pursuant to § 8 (3) No. 1  Unfair Competition Law. The fact that both Respondent and the Petitioner are active in the area of the pursuit of copyright infringements does not, by itself, permit the conclusion that they are competitors within the meaning of § 8 (3) No. 1  Unfair Competition Law. Competitors in the foregoing sense are solely businesses that attempt to market the same or similar goods or services within the same group of customers ( Federal Supreme Court GRUR 2007, 884 note 35 — Cambridge Institute;  Federal Supreme Court GRUR 2007, 1079 note 18 — Federal Printer;   Federal Supreme Court G[ewerblicher]R[echtsschutz und]U[rheber]R [echt=Commercial Legal Protection and Copyright Law] 2009, 845 note 40 — Internet Video Recorder;  Federal Supreme Court GRUR 2009, 980 note 9 — Email advertising II). It cannot be contended that the Respondent and die Petitioners offer the same or similar services. The Petitioners offer investigative services in the Internet. The Respondent offers, however, exclusively legal advice and representation. The fact that the services of both parties relate to copyright infringement does not change the distinction between such services.

**b.    Statement to  Ms. Mudge neither an Allegation nor an Interference with Competitors**

In the statements made to Ms. Mudge, there were neither facts within the meaning of  § 4 No. 8 Unfair Competition Law alleged nor was a competitor interfered with pursuant to § 4 No. 10 Unfair Competition Law. Since Ms. Mudge is an employee of Petitioner No. 1, the statements made to her are to be attributed to the Petitioner [sic] pursuant to § 166 Civil Code] analogously.

Allegations pursuant to § 4 No. 8 Unfair Competition Law must be made, however, to third parties. The competitor affected by such allegation is not included in third parties in such sense. Allegations made to it are not capable of fostering or interfering with the sales or supplies of the business in question. This would only be true in the case allegations to persons who are not "in the camp" of the  Petitioners.

The same applies to unfairness pursuant to § 4 No. 10 Unfair Competition Law. An interference is

excluded if it occurs [sic: I think what is meant is that the "allegations" are made, and thus occur, but not, obviously, the interference, which is being denied] as a result of allegations made to a business affected by the allegation. In such case, the allegation is not capable of resulting in an interference with the competitor.

**c. No claim for Injunctive Relief for the Statements that are the Subject of the Dispute**

**aa.    Evidentiary Value of the Affidavit of Ms. Barbara Mudge**

In light of the abridged, "summarized in gist" and incorrect representation of the contents of the telephone conversation between Ms. Mudge and Mr. Nourbakhsch, the Affidavit of Ms. Mudge has no evidentiary value.

**bb.    As to the Allegation in Heading Point 1. a) — Theft of the Software**

With respect to the statement under Point 1.a) of the heading, neither of the Petitioners have a claim for injunctive relief. The conditions of § 4 No. 8 Unfair Competition Law and § 823 (2) BGB, read together with § 186, 187 Criminal Code are not satisfied. Since Mr. Nourbakhsch never claimed that Petitioner No. 2 stole the software used by Petitioner No. 1, he did not publicize any untrue fact.

In all other respects, the statements of Mr. Nourbakhsch to Ms. Mudge as the representative, or at least the agent of, Foresight Unlimited, the client of the Respondent, were confidential statements, as to which the client of the der Respondent had a justified interest, § 4 No. 8, 2nd clause, Unfair Competition Law. Communication between attorney and client are subject, pursuant to § 43 a (2) Federal Attorney Regulation , to attorney confidentiality. At the European level, attorney confidentiality is protected pursuant to Art. 8 (1) European Human Rights Convention (protection of correspondence) read together with Art. 6 (1) and (3) letter c European Human Rights Convention (right to fair proceeding) as well as Art. 7 of the Charter of Basic Rights of the European Union (respect for communications) read together with Art. 47 (1), (2) sent. 2 and Art. 48 (2) of the Charter of Basic Rights of the European Union (right to advice, defense and representation, respect for rights of defense). The European Court of Justice has expressly confirmed the protection of attorney confidentiality (European Court of Justice in: NJW 1983, 503). Communications underlying attorney confidentiality is to be categorized as confidential and privileged. In addition, the confidentiality of the statement is a consequence of the fact that Mr. Nourbakhsch's statements were made to only one recipient and not to a large number of recipients. Such communications are, in the view of the Federal Supreme Court, to be classified as confidential ( Federal Supreme Court GRUR 1960, 135 (136) — Printing Orders).

Mr. Andre Nourbakhsch, as well as the client of the Respondent, Foresight Unlimited, also otherwise had a justified interest in the communication. To be considered, in a balancing of the interests, is, whether the person making the statement is legally or contractually required or obligated to communicate the facts (Köhler/Bornkamm, [Commentary on the] Unfair Competition Law, 29th ed., 2011, § 4, note 8.23). Mr. Nourbakhsch, as an attorney, commissioned and obligated to protect the interests of his client, Foresight Unlimited. This is a direct consequence of the statutory and contractual obligation of the attorney to notify and warn (Kleine-Cosack, [Commentary on the] Federal Attorney Regulation, 6th ed., Attachment I 1, § 11 Professional Regulation of Attorneys). Neglect of such obligations would have subjected the Respondent to a potential liability claim by its client. It is not only the right, but also the obligation, of the attorney to prevent such from the outset.

The interest of the client of the Respondent in the information constituting the subject of the dispute is, as a result of the large number of cases processed by using the „Observer" investigative software of Petitioner No. 1, is to be classified as very important.

**cc.    As to the Statement in Heading Point 1. b) aa) Unreliable Investigative Services**

Nor, with respect to the statement under Point 1.b) aa) of the Heading, does either Petitioner have a claim for injunctive relief. Here as well, the conditions of § 4 No. 8 Unfair Competition Law

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 23 of
Case 5:11-cv-02083-JW   Document 55-7   Filed 11/20/12   Page 24 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 16 of 18

and § 823 (2) BGB read together with § 186, 187 StGB are not satisfied. Petitioner No. 1 provided unreliable investigative services, with the result that the statements forming the subject of the dispute are true facts.

In all other respects, here as well, Mr. Nourbakhsch's statements to Ms. Mudge, as representative of the client of the Respondent, Foresight Unlimited, constitute confidential communications, to which both the client of the Respondent and the Respondent have, for the same reasons, a justified interest, § 4 No. 8, 2nd clause Unfair Competition Law.

**dd.**   **As to the Statement in Heading Point 1. b) bb) — Pending Class Action Suit in the USA**

Nor, with respect to the statement under Point 1.b) bb) of the Heading, does either Petitioner have a claim for injunctive relief. The conditions of § 4 No. 8  Unfair Competition Law and § 823 (2) BGB read together with § 186, 187Criminal Code are not satisfied. Mr. Nourbakhsch did not publicize any untrue facts.

As set forth above, a class action complaint in the name of 4,576 persons is pending in the USA against Petitioner No. 1. "Pending" means that the complaint has been filed with the court. "Legally pending" means that it has been served upon the defendant. Mr. Nourbakhsch did not say anything about legally pending, but rather only that a complaint was pending against Petitioner No. 1. The question of whether the complaint has been served upon the Petitioner No. 1 is thus not relevant for the decision.

In all other respects, here again, Mr.  Nourbakhsch's statements to  Ms. Mudge, as representative of the client of the  Respondent has a justified interest, § 4 No. 8, 2nd clause Unfair Competition Law. We refer to the foregoing explanations.

**ee.**   **As to Heading Point 1. b) cc)**

Point 1.b) cc) of the order of injunction is to be abrogated, due to lack of definitiveness, pursuant to § 253 (2) No. 2 Code of Civil Procedure . It is not clear, from the Heading, which contractual relationship is at issue. It is possible that the contractual relationship between Petitioner No. 1 and the Respondent is meant. But the Heading can also be interpreted to mean that the term "contractual relationship" means the contractual relationships between Petitioner No. 1 and its clients.

In addition, as a result of the reference in the Heading to the Affidavit of Ms. Barbara Mudge, it is not clear in what cases the Respondent is enjoined from contacting clients of Petitioner No. 1. Is contact for the purpose of offering cooperation without the assistance of  Petitioner No. 1 only enjoined when one of the statements in Points 1. a), 1. b) aa) to cc) is made thereby, or only when all of such statements are made? Where, in the first case, is the substantive difference of the Heading in Point 1 b) cc) and the other Points of the Heading? Point 1. b) cc) of the Heading cannot be executed, due to lack of definiteness.

If the term „contractual relationship" in Point 1. b) cc) of the Heading refers to the contract between Petitioner No. 1 and  Respondent, then the claim for injunctive relief of Petitioner No. 1 under § 8 (1) read together with §§ 3, 4 No. 10  Unfair Competition Law fails, as a substantive legal matter, due to the fact that the contractual relationship between the parties was terminated as of 1/21/2011. The fact that the Respondent, following  the termination of its contract with Petitioner No. 1, makes contact with the latter's clients, does not, by itself, result in unfairness pursuant to § 4 No. 10  Unfair Competition Law. Because luring away clients is in the nature  of free competition, even when it is accomplished intentionally and systematically (on the basis of a plan) and the clients are still contractually bound to the competitor. As a result, objection can basically not be made when a business works to effect the dissolution of a contract in compliance with statutory or contractual provisions (termination, rescission or revocation periods) and takes advantage of the same for its own competitive purposes. Intruding into third-

16

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 24 of
Case 5:12-cv-02088-JMB #5 Document 55-7 3 Filed 11/20/12   Page 25 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 17 of 18

party contractual relationships only becomes unfair when special circumstances are present (Köhler/Bornkamm, [Commentary on the] Unfair Competition Law, 29th ed., 2011, § 4, note 10.33, referring to   Federal Supreme Court GRUR 1997, 920 (921) — Vending Machine Installers;   Federal Supreme Court GRUR 2002, 548 (549) — Reimbursement of Car Rental Expenses;   Federal Supreme Court GRUR 2004, 704 (705) — Departure Letter). Thus, if a sales representative who has left the company uses customer addresses that he has in his memory, this does not constitute anti-competitive behavior (Federal Supreme Court GRUR 1999, 934 (935) — Wine Consultant).

Even if there were a contractual relationship between Petitioner No. 1   and the Respondent, however, there would still be no claim for injunctive relief.

The fact that Respondent contacts possible clients of Petitioner No. 1 for the purpose of offering continued cooperation without the assistance of Petitioner No. 1, does not by itself result in unfairness. As set forth above, Ms. Barbara Mudge called Mr. Nourbakhsch at the order, or at least with the authorization, of a client of the Respondent, Foresight Unlimited, represented by Mr. Mark Damon. The knowledge of the contact data pertaining to Mr. Mark Damon was thus not based on the contractual relationship between the Respondent and Petitioner No. 1, but rather on the client relationship between Respondent and Foresight Unlimited. It is thus not true that the Respondent used customer addresses that had been entrusted to it or which it had obtained illegally, and thus resources to which it had no right. The instant case is not comparable with cases where employees approach customers of the employer, during the existence of the employment relationship, in order to obtain them as future customers for their own, or a third-party, business.

Irrespective thereof, the sole deciding factor is that the Respondent contacted only its own clients. That they are, or were, simultaneously customers of Petitioner No. 1, is irrelevant.

In addition, as previously set forth,   Mr.   Nourbakhsch in no way, either directly or indirectly, introduced or offered to the customers of Petitioner No. 1 services or business such as those of Petitioner No. 1.

On the basis of all of the foregoing, the preliminary injunction is to be abrogated.

In the event that the Court is of the view that the pleading of the Respondent is inadequate or needs to be supplemented, we request an appropriate notice from the Court. In such event, the Respondent will gladly supplement its pleadings extensively.

In the event that the Court requires a certified translation of **Exhibits AG 3, 19 and 20**, we also request a notice from the Court.

Service on the Petitioners shall be accomplished from attorney to attorney pursuant to § 174 Code of Civil Procedure .

Susanne Preuß
Attorney at Law

Case 1:12-cv-01875-REB-MEH   Document 19-3   Filed 11/15/12   USDC Colorado   Page 25 of
Case 5:12-cv-02088-JW   Document 55-9   Filed 11/20/12   Page 26 of 26

Case 1:10-cv-12043-GAO   Document 55-9   Filed 06/13/11   Page 18 of 18

**Exhibits**

AG 1    Extract from the Register of the Companies' House
AG 2    Commercial Register extract for Petitioner No. 1
AG 3    Affidavit of Petitioner No. 2 before the United States District Court for the District of
        Columbia of 12/31/2009 (File no.: CA. 1:10-cv-00453-RMC) in English
AG 4    Affidavit of Petitioner No.2
AG 5    Termination Letter of Respondent of 1/21/2011 with transmission report of the fax
        transmission on 1/21/2011, 20:07
AG 6    Telefax of the termination letter of Petitioner No. 1 of 1/25/2011, 14:37
AG 7    Email of Ms. Barbara Mudge of 2/25/2011
AG 8    Affidavit of Mr. Richard Schneider, Member of the Administrative Board of Logistep   AG
AG 9    Commercial Register extract of Logistep AG
AG 10   Affidavit of Mr. Michael Wicher, employee of Logistep AG
AG 11   Affidavit of Mr. Leszek Oginski, Director of Logistep AG
AG 12   Email of Petitioner No. 2 of 12/10/2008
AG 13   Email of Petitioner No. 2 of 11/30/2010
AG 14   Email of Mr. Nourbakhsch of 1/12/2011 with attachments
AG 15   Email of Petitioner No. 2 of 1/14/2011
AG 16   Presentation of reference customers of ipoque GmbH under their Internet presence at      http://
        www.ipoque.com/company/customer-references
AG 17   Powerpoint Presentation of ipoque GmbH „Facts on the Cease and Desist Letter about
        "Antichrist," BaumgartenBrandt to ipoque, 11/18/2009" of 1/13/2011
AG 18   Cease and Desist Letter to ipoque GmbH of 4/27/2010
AG 19   Class Action Complaint of 4,576 plaintiffs against, inter al., Petitioner No. 1, available on
        line at http://boothsweet.com/wp-content/uploads/2010/08/Master-Complaintl.pdf, by the law
        firm of BOOTH SWEET LLP
AG 20   Notice of the United States District Court, District of Massachusetts to the defendants as to
        the filing of a complaint, of 11/26/2010